AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  25-SW-267 |
| TWO CELL PHONES UNDER RULE 41 | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1 and A-2 (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed  *(identify the person or describe the property to be seized)*:

See Attachments B-1 and B-2 (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Bryan Mancuso, Detective
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

Telephone _____  *(specify reliable electronic means)*.

Date:  ____9/15/2025____

_____
*Judge's signature*

City and state:  ____Washington, D.C.____

Matthew J. Sharbaugh
(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means         ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.   25-SW-267 |
| TWO CELL PHONES UNDER RULE 41 | ) |
| | ) |
| | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachments  A-1 and A-2 (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachments  B-1 and B-2 (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before         September 29, 2025         *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Matthew J. Sharbaugh _____ .
                                                                                   *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 9/15/2025 _____         _____
                                                                              *Judge's signature*

City and state: _____ Washington, D.C. _____         Matthew J. Sharbaugh
                                                                         United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>25-SW-267 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

## Certification

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A-1</u>

*Property to be searched*

The property to be searched is one Samsung Galaxy S9 with IMEI 353305095970466 and one Android cell phone with IMEI 352082503403405179, hereinafter referred to as the "TARGET DEVICES." The TARGET DEVICES are currently stored at the FBI's Washington Field Office, located at 601 4th St NW, Washington, D.C.

## **ATTACHMENT B-1**

*Property to be seized*

1.     The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to the commission of Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. § 2423(b) (the "TARGET OFFENSE") as described in the search warrant affidavit, including, but not limited to call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data that contain, constitute evidence of, document, establish, identify, or reflect:

    a.  Child pornography and child erotica;

    b.  Any communications between Holley and any other individuals regarding the sexual abuse of children;

    c.  Establishing or documenting the commission of the TARGET OFFENSE;

    d.  Identifying locations where the individual committed the TARGET OFFENSE, traveled to before and after the commission of the TARGET OFFENSE, and in preparation for the TARGET OFFENSE;

    e.  Reflecting the ownership and use of the item identified in Attachment A by the individual committing the TARGET OFFENSE;

    f.  Documenting meetings and communications between individuals committing one or more of the TARGET OFFENSE;

    g.  Reflecting communications between the individual committing one or more of the TARGET OFFENSE and other individuals, discussing the commission of one or more of the TARGET OFFENSE;

h.  Reflecting communications between the individual committing one or more of the TARGET OFFENSE and other individuals who may have assisted or provided support in the commission of one or more of the TARGET OFFENSE;

i.  Containing photographs or video that would constitute evidence of a violation of the TARGET OFFENSE;

j.  Documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband in violation of the TARGET OFFENSE; and

k.  Records and information related to the email addresses, phone numbers, social media, account identifiers used by perpetrators, aiders and abettors, co-conspirators, and accessories after the fact concerning the TARGET OFFENSE;

l.  Evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

m.  Evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

n.  Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

2

o.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

p.  Evidence of the times the Device(s) was used;

q.  Passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

r.  Documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

s.  Records of or information about Internet Protocol addresses used by the Device(s); and

t.  Records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media

that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

## ATTACHMENT A-2

AUTHORIZATION TO ACCESS AND SEARCH TELEGRAM ACCOUNTS INSTALLED ON DEVICES DESCRIBED IN ATTACHMENT A-1

In addition to the above, this warrant authorizes law enforcement to access Telegram accounts installed on devices in the custody of the FBI described in Attachment A-1. This warrant further authorizes law enforcement to download the contents of any such Telegram accounts and search for the evidence described in Attachment B-4.

The contents of Telegram accounts are stored at locations concealed through technological means and cannot be secured through the service of legal process directed to Telegram. However, the Telegram application is likely to be installed on digital devices in the custody of the FBI described in Attachment A-1, and the contents of Telegram accounts can be accessed from such devices through the Telegram application. If the Telegram application is installed on any devices seized pursuant to this warrant, law enforcement may access the application and the contents of the corresponding Telegram account(s) directly from the device, copy its data, and search the contents of the Telegram account for evidence of child pornography offenses as described in Attachment B-4.

## **ATTACHMENT B-2**

1. Evidence, in any form, of violations of 18 U.S.C. § 2423(b) (travel with intent to engage in illicit sexual conduct) or other child exploitation offenses.

2. Images of child pornography and files containing images of child pornography;

3. Information, correspondence, communications, and other materials constituting evidence of, or pertaining to, the sexual exploitation of minors;

4. Any and all records, documents, e-mails, telephone numbers, text messages, correspondence, communications, images, internet search history, or other information, which evince a sexual interest in minors or child exploitation;

5. Records and information relating to the existence of internet sites, social media applications, file sharing applications, or chat applications, related to child pornography or a sexual interest in children;

6. Information which evinces ownership or use of any social media accounts, financial accounts, email accounts, computers, cell phones, or other devices, to include usernames, passwords, location information, IP information, etc.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TWO CELL PHONES UNDER RULE 41 | 25-SW-267 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Bryan Mancuso, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, a Samsung Galaxy S9 with IMEI 353305095970466 and an Android cell phone with IMEI 352082503403405179 (hereinafter, the "TARGET DEVICES"), as described in Attachment A that is currently in the possession of the Federal Bureau of Investigation located at 601 4th St NW, Washington, D.C. Such a search would include an examination of the seized device for information described in Attachment B.

2.      Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance and is not intended to be a verbatim recitation of such statement. Wherever in this affidavit I quote statements, those quotations have been taken from draft transcripts, which are subject to further revision.

3.      Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I've drawn from my training, experience, and knowledge of the investigation.

1

**AFFIANT BACKGROUND**

4.      Your affiant, Detective Bryan Mancuso, has been a sworn member of the Metropolitan Police Department of the District of Columbia (hereinafter "MPDC") since 2008, and is currently a Detective assigned to the Federal Bureau of Investigation ("FBI") and the Metropolitan Police Department's Child Exploitation Task Force. Your Affiant has investigated sexual offenses involving children since 2014, as a Task Force Officer ("TFO"). Your Affiant is responsible for investigating internet crimes against children such as the production or distribution of child pornography, as well as for investigating allegations of commercial sex trafficking of children and has been deputized as a federal law enforcement officer by the United States Marshal Services. Throughout my career, your Affiant has received specialized training regarding sexual abuse of children, sexual assaults, and sex trafficking. Your Affiant has gained expertise in conducting such investigations through formal training and on-the-job training with more experienced agents. Your Affiant has received training and experience in interviewing and interrogation techniques, arrest procedures, and a variety of investigative tools available to law enforcement officers. Your Affiant has previously sworn to and obtained search warrants in Superior Court and the District Court of the District of Columbia which have led to the recovery of evidence and arrests of criminal offenses. As a Task Force Officer with the FBI, I am authorized to execute warrants issued under the authority of the United States.

5.      As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

7.     Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 2423(b) (the "TARGET OFFENSE") have occurred. There is also probable cause to search the TARGET DEVICES, further described in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8.     The property to be searched is a Samsung Galaxy S9 with IMEI 353305095970466 and an Android cell phone with IMEI 352082503403405179 (the "TARGET DEVICES"). The TARGET DEVICES are currently in the possession of the Federal Bureau of Investigation located at 601 4th St NW, Washington, D.C.

## PROBABLE CAUSE

9.     On Thursday, August 28, 2025, an FBI Task Force Officer (TFO) working with the Washington Field Office was acting in an undercover (UC) capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation (MPD-FBI) Child Exploitation Task Force, operating out of a satellite office in Washington, D.C.  In that capacity, the UC entered a fetish website.  Different areas of this site are known to the UC as places where people meet, discuss, and trade original images of underage children, links containing child pornography. On August 28, 2025, a user using the screen name "FeetAddict202" and stating his location to be Owings Mills, MD, later identified as Jordan Holley, initiated a private message chat with the UC within

the fetish website.[1]

      10.    The following is the chat between Holley and the UC on the fetish website:

FeetAddict202: If you ever want to teach her about BBC[2] or cock in general, use me as a stunt cock for her practice.

UC: lol i think we might be liked minded

FeetAddict202: When I saw your post I figured we would be. Too many bulls scared to doit but im not. If you're going to introduce your daughter to the world of BBC and cock, why not have a real one for her to use as practice

FeetAddict202: I am Brutus, and ill be your BBC you have your daughter practice with as you watch. How's that for kinky fun? (wink emoji)

UC: where else do you like to chat I like where this is going

FeetAddict202: "Kik, telegram, my number, even email. Pick any. I'm serious about this. Live action porn in your own home. Me and her. Our secret fun time."

UC: whats your number

FeetAddict202: 443-834-XXXX

      11.    On Thursday, August 28, 2025, the UC sent a message to 443-834-XXXX, stating, "It's Rob from [aforementioned fetish website]".  The user responded, "Hey Rob. Its Brutus. Glad we met."  The following is a portion the text messages sent between the UC and HOLLEY:

      UC: Yes not fantasy right

---

[1] The UC referenced having a young daughter on a group message within the fetish website.
[2] BBC is commonly used as slang for Big Black Cock

HOLLEY: Correct. Real life. I have experience with daughters and fathers, you found the right bull for the job

UC: Ok any age limits before we discuss my girl not trying to get caught up

HOLLEY: No sir. Only a number for me

UC: Fuck yeah we are very like minded

HOLLEY: Perfect. I understand wanting to be careful. Most wouldn't do this but I am a special bull.[3] 1 for families. Even when divorced. A father deserves to know how his daughter handles cock

UC: Well to be honest she plays with mine and had an old college buddy in town about six months ago and loved watching her sucking his cock

Holley: That's real hot. A true good daughter. Is she a virgin or has that been taken care of?

12.     As the chat continues, the UC asked Holley, "Whats the youngest you've been with," and HOLLEY replied, "Interesting. Wanna watch me rub mine against her puffy?[4] Maybe she can lose it to a BBC like a real good girl" and "Age 10." The UC stated to HOLLEY, "Ok my girls 9 want to make sure you're ok with that." HOLLEY replied "All good, territory im familiar with. Best part is we can make it a regular thing. And train her for life as a slut"

13.     During the chat the UC asked HOLLEY if all he wanted to do was rub her "puffy," referring to his purported 9-year-old daughter, and HOLLEY responded with, "No sir. Get sucked by her, have her give me a handjob, footjob, rub her pretty lil nipples and bust nuts on her and eventually in her" and "The 1 thing i want the most: her pussy. I want her virginity."

---

[3] The bull is a man who is introduced to the relationship to have sex with the wife or female partner.
[4] A puffy is commonly referred to as a prepubescent vagina.

14.     During the chat, the UC sent an image of his purported daughter.[5]  HOLLEY responded, "Oh wow, thats perfect honestly. I am built just right for her," and sent an image of an erect penis.  The UC replied, "She's going to love it." HOLLEY replied, "Fit for a princess like her. Best part is we have plenty of time. I want her to see it, play with it, get used to it. Compare it. BBC for her is like giving her keys to her first car."

15.     While the chat continued, the UC and HOLLEY discussed scheduling a meet for the purpose of HOLLEY traveling to the UC's purported residence in DC to engage in vaginal intercourse and sexual activity with the UC's purported 9-year-old daughter.  HOLLEY confirmed that he would be traveling to the UC's residence on September 4, 2025, at 11 AM to engage in sexual intercourse with the UC's purported 9-year-old daughter.  HOLLEY subsequently rescheduled the meeting to September 10, 2025.

16.     HOLLEY was identified using law enforcement databases. The phone number 443-834-XXXX was associated with Jordan Holley, born on June XX, 1991, in numerous law enforcement citations and databases.  HOLLEY has multiple prior traffic citations from the Baltimore County (MD) Police Department. The phone number HOLLEY provided in connection with those citations was 443-834-XXXX.  According to law enforcement databases, Holley currently resides at XXXX Hanwell Rd, Randallstown, MD 21133.  This is consistent with FeetAddict202 indicating his location was in Maryland. Owings Mill is approximately a ten-minute drive from Randallstown, Maryland.

17.     On September 04, 2025, Holley advised that he had to cover meetings at work and that he would not be able to meet at the arranged time. Holley and the UC discussed rescheduling, and Holley confirmed that he would be traveling to meet the UC at the prearranged

---

[5] The image sent by the UC did not depict a real child or sexual abuse material.

location and then to the UC's residence on September 10, 2025, at 11:30 AM to engage in sexual intercourse with the UC's purported 9-year-old daughter.

18.     On September 10, 2025, at approximately 12:25 PM, Holley arrived at the prearranged location at sat with the UC.  The UC asked if he was Brutus the name that Holley advised during the Conversation with the UC.  The UC then stated, "this has been a long time coming, can't wait," to which Holley stated, "yes, can't wait."  Holley was placed under arrest at that point by members of the FBI/MPD Child Exploitation Task Force members.

19.     Holley was identified as Jordan Holley, DOB: 06/XX/1991, with an address of XXXX Hanwell Rd, Ransdallstown, MD 21133, through his Maryland driver's license which he had on his person.  Law enforcement recovered a mask, sex toys, condoms, and lubrication in Holley's vehicle.

20.     Investigators conducted a custodial interview at which time Holley waived his Miranda rights and wanted to give a statement.  During the course of the interview, Holley advised that he travelled from Maryland to Washington, DC, to meet with the UC.  Holley admitted to arranging to travel to Washington, DC, to meet the UC and his purported 9-year-old child and have vaginal intercourse with the child.  Holley stated that the sexually exploitive conversation and meeting was to learn more about the UC, but that he planned to call law enforcement and not go through with it.

21.     Holley had one cell phone on his person, a Samsung Galaxy S9 IMEI 353305095970466, and one cell phone in his vehicle, an Android cell phone IMEI 352082503403405179.  During his interview with law enforcement, Holley advised that he accessed the fetish website using multiple devices.

**Probable cause to remotely access the SUBJECT TELEGRAM ACCOUNT**

22.     As explained above, Holley stated to the undercover agent that he used Telegram and that the agent could contact him on there to further discuss child sexual abuse.

23.     Telegram is an internet-based messaging and social-media application for smartphones, tablets, and computers. Users can transmit messages, photos, videos, and other types of files with one another. Users can also create and participate in "groups," which allow up to 200,000 users to exchange messages and files, including photos and videos.

24.     Telegram uses encryption properties to foster privacy and security in messaging. The companies that control Telegram are not based in the United States, and Telegram does not respond to process issued by United States law enforcement agencies. According to the "Frequently Asked Questions" section of its website, Telegram does not process any requests related to illegal content within private group chats. In addition, the "Frequently Asked Questions" page also states that Telegram deliberately maintains data across multiple nations to make it impossible for a single government to compel access to user data. It stores cloud chat data in multiple data centers around the world that are controlled by different legal entities spread across different jurisdictions. Telegram states that, as a result, several court orders from different jurisdictions are required to force it to provide any data. As of July 18, 2024, the Telegram website states that it has never disclosed user information to governments, making it an ideal platform for individuals engaged in the sale, receipt, and distribution of child pornography.

25.     Because Telegram uses technological means to deliberately conceal the jurisdiction where its information is located, law enforcement has no means of preserving the contents of Telegram accounts, or securing the content of Telegram accounts through search

warrants or other legal process. Accordingly, Telegram is subject to the type of remote search requested by this warrant pursuant to Federal Rule of Criminal Procedure 41(b)(6)(A).

26.     Since Holley's statement to the undercover agent indicates that he uses Telegram to discuss child sexual abuse, there is probable cause to access Holley's Telegram account.

## CHARACTERISTICS OF INDIVIDUALS WHO COMMIT CHILD SEX ABUSE OFFENSES AND CHILD PORNOGRAPHY OFFENSES

27.     The information set forth in this Affidavit indicates that GREEN has a sexual interest in children and in sexually explicit images and videos of children. Based on participation in investigations of child sexual abuse and child pornography offenses and based on discussions with agents who have investigated child pornography and child sexual abuse cases, I have learned that individuals who possess or traffic in child pornography are often individuals who have a sexual interest in children and in images of children. There are certain characteristics common to such individuals, including the following:

a.     Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses (such as in person, in photographs, or other visual media), or from literature describing such activity.

b.     Such individuals may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Such individuals oftentimes use these materials for their own sexual arousal and gratification. They may also use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts. With the development of technology, digital devices including laptops, tablets,

and smart cellular phones are used to search for, access, download, possess, receive and distribute these materials.

c.     Individuals who have a sexual interest in children or images of children frequently maintain copies of child pornographic material in the privacy and security of their home or some other secure location. Frequently, these images and videos are kept on handheld mobile computing devices, like tablets, laptops, and cellular phones. These are commonly kept close to the individual who owns them, either on their person or at their residence. These items are commonly found during the execution of residential search warrants.

d.     Likewise, such individuals often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer or mobile computing devices, including smartphones and tablets. These collections are often maintained for several years and are kept close by, usually at the individual's residence, or on the individual's person, to enable the individual to view the collection, at any time. These individuals often take steps to ensure that other individuals, who do not share their sexual interest in children, cannot access these devices and discover what is contained therein.

e.     Due to the accessibility and availability of child pornography on the Internet, in your affiant's recent experience, instead of maintaining collections, some such individuals engage in a pattern of viewing or downloading child pornography online and then deleting the material. This conduct also usually occurs at the individual's residence or some other secure location. It is also not uncommon for offenders to commit child pornography violations using only mobile computing devices, such as smart phones and tablets or for these individuals to store these materials in a cloud/online storage account in an effort to avoid law enforcement detection.

f.    Such individuals also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. Such items are commonly found on these individuals mobile computing devices.

g.    Such individuals prefer not to be without access to child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

## TECHNICAL TERMS

28.    Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.    "Digital device," as used herein, includes the following three terms and their respective definitions:

1)    A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)    "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books";

12

sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

        c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

        d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

13

e.    "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.    "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.    Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.    The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the

14

Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.     "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same

time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

        i.   When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

        ii.   Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

        o.   "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

        p.   "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption

algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.    "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

29.    As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Device, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus,

the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Device for at least the following reasons:

  a. Individuals who engage in criminal activity, including the possession, production, receipt, and/or transportation of child pornography, use digital devices, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts.

  b. Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

  c. Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually

disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

30.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular,

records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b. Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs,

photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.   I know that when an individual uses a digital device to commit child exploitation offenses, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.

22

The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

31.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital

23

devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.

Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are

often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

    f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

  32. The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

    a. Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

      i. Law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, transport the TARGET DEVICES to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES. The digital devices,

and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

ii.   The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

iii.   In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## **CONCLUSION**

33.    Based upon the above-referenced facts, your affiant asserts that there is probable cause to believe that the TARGET DEVICES contain evidence of the TARGET OFFENSE.

34.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

35.    I further request that the Court permit the search warrant to be executed at any time given that the TARGET DEVICES are contained on the premises of the Federal Bureau of Investigation located at  601 4th St NW, Washington, DC.

Respectfully submitted,

_____

Detective Bryan Mancuso
Metropolitan Police Department

Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 15th day of September, 2025.

_____

The Honorable Matthew J. Sharbaugh
United States Magistrate Judge

28